Moncure, J.
This case involves the question, whether the fifteenth section of the act passed March 2,1854, entitled “ An act imposing taxes for the support of go *3 vemment,” which declares that “the tax on the estate of a decedent, prescribed by the thirty-ninth chapter of the Code of Virginia, shall be two per centum of such estate,” (Sess. Acts p. 7,) was repealed by implication by the act passed March 18, 1856, having the same title, (Sess. Acts p. 11,) there being no such provision in the latter act.
This question was noticed in the opinion of Judge Lee in Eyre v. Jacob, 14 Gratt. 422, and he inclined to think there was no such repeal, but thought it unnecessary to express an opinion upon it. Id. 440. It was not decided, and did not, in fact, arise in the case, but comes up now, for the first time, to be decided by this court.
It was stated on the one side; and conceded, I believe, on the other, in the argument of this case, that. it was the uniform and unvarying practice of the legislature, from the very organization of the government down to the time of the adoption of the present Code, (or at least, the session of 1848-9, when the Code was under consideration,) to pass an annual tax law, embracing all the taxes imposed for the support of government during the current year; and no instance occurred during all that period, of a permanent tax, or one which was created to endure longer than a year.
The revisors proposed a change of tills practice, and recommended a scheme of taxation which is substantially embodied in the Code. Their reasons for doing so are set forth in a note to chap. 40, page 230, of their report; in which they say: “It has been the usage to pass a law annually on this subject; each law being a copy, of nearly a copy, of that which preceded it. But it is a usage for which no very good reason is perceived. Formerly, when there were few subjects of taxation, the annual law was a short one. But now it occupies six pages of the Session Acts. The present chapter, though embracing every subject, curtails the length of *4 the law, and will render it unnecessary to do more- in any year than alter the rate of taxation when there is occasion for it. If not altered, the previous law will remain in force. Such a law as- this will not only save ■ legislation and printing, when there- is no occasion to change the law, hut will guard against the possible contingency of a failure on the part of the two houses of tiie assembly to agree upon a new revenue law.”
The proposed scheme is embodied in chapters 35, 38, 39 and 40 of the Code. The first three of these chapters provide for the assessment of taxes; the 35th on property, the 38th on licenses, and the 39th on dividends, certain estates of decedents, process in suits, official seals and deeds, wills and administrations. The 40th chapter prescribes what is tobe collected on each subject of taxation; and embraces four sections, declaring the yearly amount of taxes, to wit: § 1, on the persons and subjects mentioned in the 35th chapter; § 2, on the licenses mentioned in the 38th chapter; § 3, on the subjects mentioned in the 39th chapter; and § 4, on each officer of government receiving a salary out of the treasury other than the governor or a judge: the subject of this section being mentioned in none of the preceding chapters, because the tax is directed to be deducted at the time the salary is audited and paid, and therefore, neither the commissioner of the revenue nor the sheriff has anything to do with it.- The first three of these four chapters depend on the last, and without it, or something else in its stead, are ineffectual. A repeal of the last, in whole or in part, if nothing else be adopted in the place of what is repealed, is a virtual repeal, or suspension to' the same extent, of that which depends upon it. There can be no tax unless its amount, or the means of ascertaining its amount be prescribed by-law.
The tax in question, called the tax on collateral inheritances, is imposed by the Code; the portions of it relat *5 ing to this tax being, cli. 35 § 42 p. 184, ch. 39 §§ 6-12 pp. 214 and 215, and ch. 40 § 3 p. 220. The last chapter and section declares in regard to it, that “the tax on the estate of a decedent, prescribed by the 39th chapter, shall be two per centum of such estate.”
The Code was adopted in August, 1849, and took effect on the 1st of July, 1850. No tax law was passed at the session of the legislature of 1849-50; consequently the tax law contained in the Code, without alteration or addition, was the law of 1850.
In 1850-51, Sess. Acts p. 3, an act was passed imposing taxes in addition to the taxes then imposed by law, on certain subjects. This act was an amendment of the tax law contained in the Code; which,.as thus amended, •was the law of 1851.
In 1851 the present amended constitution was adopted, which made important changes on the subject of taxation and finance, (see Art iv. §§ 22, 23, 24, and 25,) and went into operation at the close of that year.
In 1852, at the first session of the legislature under the new constitution, it became necessary to conform the tax law to the provisions of that instrument, and several acts were .passed for that purpose: as “An act concerning commissioners of the revenue,” passed April 24, 1852, Sess. Acts p. 3; an act amendatory thereof, passed May 24,1852, Id. p. 6; “An act authorizing the issuing of licenses in certain cases,” passed June 5, 1852, Id. p. 11; and “An act imposing taxes for the support of government for the fiscal year 1852-53,” passed June 5,1852. Id. p. 14. The first section of the last act declares “that for a year there shall be levied and collected on the persons and subjects mentioned in the act of Assembly passed on the 24th day of April, 1852, and any act amendatory thereof, the taxes following, to-wit:” and then proceeds in the subsequent sections to prescribe the amount of taxes. Though thus expressly referring *6 only to the persons and subjects mentioned as aforesaid, it is a perfect tax law, and embraces other persons and subjects; indeed, alj on which a tax was intended to be imposed. The act was evidently drawn after the model of the 40th chapter of the Oode, for which it was designed as a substitute. The subjects are taken up in the same order in each; as 1st, property; 2d, licensés, and 3d, other subjects; the only material difference in the order being, that the section imposing a tax on officers of government receiving a salary out of the treasury, which is the 4th and last of the chapter, is ranged with the sections relating to taxes on property in the act. The tax on the estate of a decedent, prescribed by the 39th chapter of the Oode, is mentioned in the same words in the 40th chapter and the said act, and the same amount of twoyper eentum of such estate is imposed by-each. The words have the.same relative position in each, following those which prescribe the tax on bank dividends, and preceding those which prescribe it on process, &e.; though they form, with them, one section of chapter 40, to-wit: § 3, while they alone constitute one section of the act, to-wit: § 16. The 20th section of the act expressly repeals chapter 40 of the Oode.
In 1852-3, an act was passed (April Y, 1853,) entitled “An act concerning the assessment and collection of the public revenue,” Sess. Acts p. 9; wliich commences by declaring “that the following, in addition to the enactments of the Oode of Virginia, not hereinafter repealed, shall be permanent provisions of the revenue laws of the commonwealth,” and contains many sections; some of them introducing new provisions, others amending different sections of the Oode, and others repealing other sections of the Oode and various subsequent acts. And on the same day another act was passed, entitled “ An act imposing taxes for the support of government,” Id. p. 19; wliich commences by de *7 daring that there shall he levied and collected on the persons and subjects mentioned in the act of assembly passed on the 7th day of April, 1853, entitled an act concerning the assessment and collection of the public revenue, the taxes following, to-wit. This act is almost a literal copy of the act of 1852, page 14, except that it increases the amount of taxes, and does not, as that does, profess to be for a year only. Nor does it, as the 40th chapter of the Code does, direct the taxes to be “yearly as follows.” Like the act of 1852, it embraces the tax on “ collateral inheritances,” and expressly repeals the 40th chapter of the Code. It is a perfect tax law, comprehending all the taxes intended to be imposed for the support of government.
In 1853-4, Sess'. Acts p. 3, an act was passed entitled “An act imposing taxes for the support of government,” which seems to be a literal copy of the act of 1852-3, p. 19, containing as that does, the tax on “ collateral inheritances,” and an express repeal of chapter 40 of the Code. And it is, therefore, like that, a perfect tax law.
In 1854-5 there was no session of the legislature; and therefore the tax law passed in 1853-4 was the law for the fiscal years ending in 1854 and 1855.
In 1855-6, Sess. Acts p. 11, an act was passed entitled “An act imposing taxes for the support of government,” the commencement and first seven sections of which seem to have been literally copied .from the act of 1853-4, (except that the amount of the taxes is very much increased in the act of 1855-6,) and many other sections of the two acts bear a close resemblance; showing that the later act was penned with the former before the draftsman; though in many respects the two acts differ,, both in form and substance. The point of difference most material to the present enquiry, is that the act of 1855-6 wholly omits the tax on collateral inheritances, while it literally copies, except as to amount *8 of taxes, the section which next precedes and that which next follows the section imposing a tax on collateral inheritances in the act. of 1853-4, and also in the act of 1852-3. It contains no express repeal of chapter 40 of the Code, as does the act of 1853-4, .and also do the two next preceding tax acts.
In 1856-7 there was no session of the legislature. In 1857- 8 there was ; but no tax law was passed, and consequently the act of 1855-6 remained in full force. In 1858- 9 there was no session of the legislature, ^n 1859- 60 there was; and a tax law was passed, in which is again omitted the tax on collateral inheritances, as it occurs in chapter 40 of the Code and in subsequent acts; though a tax on “collateral inheritances” of real estate is imposed by another act then passed. Sess. Acts ch. 1, § 38.
I have thus set out in detail the course of legislation on this subject, because I thought it very material to the present enquiry; which, I repeat, is: whether the section in the act of ’53—4 imposing a tax on collateral inheritances, is repealed by implication by the act of ’55-6, which contains no such section.
The latter act contains no repealing clause or words; and therefore, it repeals nothing expressly. If it repeals any other law or part of a law, i.t only does so by implication. Statutes may be repealed by implication, as well as expressly. Every statute is by implication a repeal of all prior statutes as far as it is contrary and repugnant thereto, and that without any repealing clause. Sedg. on St. and Con. law, 123-129. Or, as it is elsewhere expressed, “every affirmative statute is a repeal by implication of a precedent affirmative statute, so far as it is contrary thereto; for leges posteriores-jyriores contrarias abrogcmt: Dwarris 673, (9 Law Lib.) But the leaning of the courts is against the doctrine. The law does not favor a repeal by implication, unless the repugnance be *9 quite plain, and then only to the extent of such repugnance. Id. 674. The presumption is that the legislature, when it entertains an intention, will express it in clear and explicit terms; and it is generally to be taken that the legislature only meant to modify or repeal the provision of any former statute in those cases where such its object is expressly declared. Id. 717. This, however, is not always the case, and statutes are often passed without the precaution being used of expressly repealing other, or parts of other statutes intended to be repealed.
"Whether a former statute is intended to be repealed by a later one, is always a question of intention, which is to be ascertained, when not plainly expressed, by construction of the later statute. The intention thus ascertained must prevail, as well in regard to the question of repeal, as in regard to any other question which can arise as to the meaning and effect of the statute. The rules of construction of a statute are in most respects the same as the rules of construction of deeds and wills; but in some respects they are not, the difference arising from the different nature of the subjects. Such of the rules of construction of a statute as seem to have a bearing upon this case will be noticed. Most of them may be found in Dwarris eh. xii.
In the exposition of a statute the leading clue to the construction to be made, is the intention of the legislator; and that may be discovered from different signs. As a primary rale, it is to be collected from the words; when the words are not explicit, it is to be gathered from the occasion and necessity of the law, being the causes which moved the legislature to enact it. Id. 693.
The safe and established rale of construction is, that the intention of the law-giver and the meaning of the law are to be discovered and deduced from a view of the whole and of every part of a statute taken and *10 compared together. It is the most natural and genuine exposition of a statute to construe one part hy another part of the same statute, for that best expresses the meaning of the makers, and such construction is ex visceribus actus. And this, construction, of itself, imports,. ex vi termini. Id. 698, 703.
As one part of a statute is properly called in ter help the construction of another part, and is fitly so expounded as to support and give effect, if possible, to the whole, so is the comparison of one law with other laws made by the .same legislator, or upon the same subject, or relating expressly to the same point, enjoined for the same reason and attended with a like advantage. In applying the maxims of interpretation, the object is, throughout, first to ascertain, and next to carry into effect the intentions of the framer. It is to be inferred that a code of statutes relating to one subject was governed by one spirit and policy, and was intended to be consistent and harmonious in its several parts and provisions. It is, therefore, an established rule of law that all acts in pari materia are to be taken together, as if they were one law: and they are directed to be compared in the construction of statutes, because they are considered as framed upon one system, and having one object in view. And the rule, it is said, equally applies, though some of the statutes may have expired, or are not referred to in the others. Id. 699, 700.
Besides the occasion and the reason of the enactment, the letter of the act, the context, the spirit of the act, the subject matter and the provisions of the act, have all to be considered. Id. 702.
It is a Avell settled rule of law, that every charge upon the citizen must be imposed by clear and unambiguous language. Statutes which impose a duty upon the public will be critically construed with reference to the particular language in which they are expressed. *11 When there is any ambiguity found, the construction must be in favor of the public; because it is a general rule, that where the public are to be charged with a burden, the intention of the legislature to impose that burden must be explicitly and distinctly shown. Id. 749. See also Plumer's case, 3 Gratt. 645.
Besides these rules, which I have taken from Dwárris, there are some others stated in Sedg. on St. and Con. law, which seem to be very pertinent to this case. After stating it to be well settled that a subsequent statute, which is clearly repugnant to a prior one, necessarily repeals the former, although it do not do so in terms; the author says: “And even if the subsequent statute be not repugnant in all its provisions to a prior one, yet if the latter statute was clearly intended to prescribe the only rule that should govern in the case provided for, it repeals the original act.” Id. 124. “ So, on the same principle, a statute is impliedly repealed by a subsequent one revising the whole subject matter of the first. And in the case of a statute revising the common law, the implication is equally strong. So where an act is an offence at common law, and the whole subject is revised by the legislature, the common law is repealed.” The following authorities are cited in support of these views, and seem fully to sustain them: Daviess v. Fairbairn, 3 How. U. S. R. 636; 16 Barbour S. C. R. 15; 12 Mass. R. 537; 5 Pick. R. 168; 10 Id. 37; 11 Id. 350. In Bartlet, &c., v. King, 12 Mass. R. 537,545, the court said: “A subsequent statute revising the whole subject matter of a former one, and evidently intended as a substitute for it, although it contains no express words to that effect, must, on the principles of law, as well as in reason and-common sense, operate to repeal the former: according to the cases of the Ren v. Cator, 4 Burr. R. 2026; and the King v. Davis, 1 Leach’s cases 306.” In Nichols v. Squire, 5 Pick. R. 169, the court affirmed the *12 same principle, observing that in Bartlet v. King, an exceedingly useful statute, passed in 1754, concerning donations and bequests to pious and charitable uses, was held not to be in force, the legislature having, in 1785, legislated upon the same subject, and omitted to re-enact 1 . .. . . . J ’ the provisions of that statute.
I will now consider the case in connection with the rules of construction and authorities before stated and referred to. The 15th section of the act of 1853-4 is not only not expressly repealed by the act of 1855-6, but there is no repugnancy between that section and any of the sections of the latter act. Both could well stand together, if such were the intention of the legislature; and such, in an ordinary case, would be presumed to be the intention of the legislature. But if, in this case, the later act revised the whole subject matter of the former, and-was clearly intended to prescribe the only rule that should govern on the subject; in other words, if it was clearly intended to be a complete tax law, embracing all the taxes in existence for the support of government after its passage; then, as a whole, it is plainly repugnant to the former act and every part of it, and as much repealed it as if that had been done in express terms. The question, and the only question, therefore, is:- Was the act of 1855-6 intended to be a complete tax law?
This question depends upon the character of the act itself, the nature of the subject, the course of prior legislation upon-it, and all the surrounding circumstances.
The act has the form and all the features of a perfect tax law. It has the appropriate title to such a law; and the same title which every such law has had since the foundation of the government, namely: “An act imposing taxes for the support of government.” It is very-long, containing more sections, probably, than any tax *13 law ever before contained; .is minute in its details; embraces several subjects not embraced in any former law, and omits very few contained in the next preceding tax law; to-wit: the act of 1853-4. It does not profess to be amendatory, or to impose additional taxes, as does the act'of 1850-51.
The nature of the subject seems to render it proper that a general fax law should be passed at every session of the legislature; and that it should be perfect in itself, embracing all the taxes intended to be imposed for the support of government. There is no legislative power which has been more carefully guarded by constitutional checks, the exercise of which is watched with more jealousy by the people, than the power to impose taxes. Hone should be imposed but what are required by public necessity and convenience; and as they are ever varying, there seems to be a fitness and propriety, if not necessity, in having complete action on the subject* at every session of the legislature. The continually recurring questions which address themselves to the legislature at each succeeding session are: How much money must now be raised for the support of government ? and on what subjects, and in what proportion, can the burden be laid with least inconvenience to the people? A heavy tax might properly be imposed ata period of great public necessity, which, when the necessity had passed away, might be unjust and oppressive to the last degree. Representative responsibility might be sufficient to prevent the legislature from passing an unjust and oppressive tax law, but not to compel them to repeal it after it had been passed by their predecessors.
The course of former legislation on the subject was accordingly uniform; and at every annual session of the legislature, from the very foundation of the government down to the adoption of the present Code, (or, at least, down to the session of 1848-9, when the plan of *14 the revisors, whose report was then under consideration, was pursued,) á perfect tax law was passed for the current fiscal year. A different policy, it is said, was then introduced. It is true, the revisors, as we have seen, recommended the plan of a permanent tax law, which was accordingly engrafted on the' Code. But it has since been partially pursued and acted on by the legislature. The Code gave the tax law for 1849-50, as it only went into effect on the 1st of July, 1850. And it partially gave the law for 1850-51, being amended by an act then passed. It has given the law for no other year, neither in whole nor in part. This has been owing in part, perhaps, to the adoption of the" new constitution, which has made radical changes on the subject of taxation; but mainly, I think, to the inherent propriety of the ancient plan. We find, therefore, that in 1852, at the first session of the legislature after the adoption of the new constitution, a perfect tax law was passed, expressly for the current year, and the 40th chapter of the Code was expressly repealed. In 1852-3, another perfect tax law was passed, though not expressly for the current year; and the 40th chapter of the Code was again repealed. And in 1853-4 another and precisely similar tax law was passed—similar even as to the amount of the taxes. And at the next session of the legislature, to-wit: in 1855-6 the act in question was passed, which, as we have seen, has the form and all the appearance of a perfect tax law. At the next session of the legislature, to-wit: in 185J-8, for .some cause, of which I am uninformed, no tax law was passed, and the act of 1855-6 therefore continued in force. This was a contingency,'to provide for which was the motive of the revisors, in part, for recommending a permanent tax law; and to that extent, such- a law has proved to -be convenient. At the last session of the legislature, to-wit : in 1859-60, another tax l^w was passed, having *15 the form and all the appearance of a perfect tax law. The practice of the government, then, as well since as before the adoption of the Code, seems to have been in favor of the plan of enacting a perfect tax law at each succeeding session of the legislature.
Convenience, if not necessity, has induced this practice. At each succeeding session of the legislature a report is made by the auditor of public accounts, showing the probable receipts and disbursements of the current fiscal year. The committee of finance reports a tax bill embracing the subjects intended to be taxed, but leaving blank the amount of tax on each subject; and the blanks are filled by the legislature, whose view in filling them is to raise only so much revenue as may be necessary for the support of government. It is extremely improbable that any subject intended to be taxed would be omitted in the bill by the committee, on the supposition that the legislature did not intend to increase the tax thereon, but intended the former law to remain in force as to such subject. This view applies with much force to the session of 1855-6, when the necessities of government required a great increase of revenue, and the amount of the former tax on each subject was generally doubled.
The reason of the thing, and all the other surrounding circumstances, seem also to concur in showing that the act of 1855-6 was intended to be a complete tax law. Of all the laws upon the statute book, none should be plainer, or freer from doubt and ambiguity, than those which impose the burden of taxes upon the people. They should be so plain that everybody may at once understand them, and especially the ministerial officers who have an agency in assessing and collecting the taxes—as the auditor, commissioners of the revenue, and sheriffs. Convenience dictates that all the taxes imposed for the support of government, should be em *16 braced in one act, so as to be seen at one view, instead of being sought for in different and scattered acts; and especially that no room should be left for doubt whether particular sections of different tax laws, though not embraced in the last, were intended to remain in force,
'^Yhat; then, was the motive of the legislature in omitting to insert in the act of 1855-6, the 15th section of the act of 1853-4? That omission was by design. They had before them tbe former in framing the later act, and copied portions of it "literally. They copied literally, except as to amount of tax, the section which preceded and that- which followed (though the latter was a long one) the 15th section in the former act. Why did they carefully omit the 15th section? Was it merely to save words ? to avoid the unnecessary insertion of only two- lines,? Did they, omit it because they intended not to increase the tax, but to let it remain as before, and therefore considered it unnecessary to repeat it in the later act ? Why, then, did they pass the act of 1853-4 at all, which was but a copy of the act of 1852-3 ? Why did they, in the act of 1855-6, insert other portions of the act of 1853-4 as to ,which no, change was made of the amount of tax'? Tbe tax on every male free negro, between 21 and 55 years of age, is' tbe same in each act. So, also, is the tax .on every license to a person selling goods by sample, card, or otherwise; except at some store or place of trade; and tbe tax on every Eeense to the owner of a jackass or stalEon, for tbe services of which compensation is received ; and tbe tax on every Eeense permitting theatrical performances in a public theatre; and on every license permitting, for a year, the sale of refreshments ¡ín a theatre during such performances. The words imposing these taxes might as well have been omitted in ¡the act-of 1855-6 as those imposing a tax on collateral inheritances, if a saving of words had been tbe only *17 motive for omitting the latter. Would the legislature, for such a motive, have left in so much doubt a matter about which their meaning should have been perfectly plain? Having embraced in the act of 1855-6 almost all the other subjects embraced in the act of 1853-4, would they not have embraced this subject also, if they had intended to continue the tax; especially when it could so easily have been done; and more especially as it liad been done in the act of 1853-4 ?
On the other hand, if we suppsse they intended to discontinue the tax, we at once see an adequate motive for omitting the subject in the act of 1855-6. For, although that may not have been the most regular mode of discontinuing the tax, it was, at least, a natural one. The legislature being engaged in framing a complete tax law, it naturally occurred to them that any existing tax omitted in that law would thereby, of necessity, be discontinued. It did not occur to them that a doubt might arise, whether the act was intended to be a complete tax law, or they would have prevented it by expressly repealing the act of 1853-4. Conceding it to be a complete tax law, it was necessarily repugnant to, and without any repealing clause ipso facto repealed, all former tax laws.
We can readily conceive the motive of the legislature for discontinuing the tax on collateral inheritances in 1855-6, if, in fact, they intended to do so. A doubt arose as to the constitutionality of the tax some time after the adoption of the new constitution, and the legislature may have determined not to impose it again; at least, until its constitutionality should be judicially affirmed. If they had been assured of its constitutionality, they would probably not only have included the tax in the act of that year, but also increased it, as they did in almost all'other cases.
But, besides the tax on collateral inheritances, some *18 other taxes included in the act of 1853-4 are omitted in the act of ’55-6, and these null now be noticed. They are three in number.
The first is the tax on the salary, not exempt from taxation, of each officer of the government receiving the same out of the treasury, other than the governor and judges, imposed by the 2d section of the act of ’53-4. This section is wholly omitted in the act of ’55-6, and I think was omitted 'for the purpose of discontinuing the tax. If it had not been intended to discontinue the tax, it would probably not only have been inserted, but increased, in the act of ’55-6, as was the tax on the income of other offices. The tax on the income'of both classes of offices was the same in the act of ’53-4, and had been the same in former acts. There is no reason for believing that a difference would have been made between them in the act of ’55-6, had it been intended to continue both. The discontinuance of a tax on the income of one of these classes was probably a-means used of making, in effect, a small addition to the salaries of that class.
But it may be said that the intention of the legislature to discontinue this tax is indicated, not only by its omission, but also by its express exception in that part of the act which imposes a tax on the income of officers of the State, “ other than that of an officer receiving a-salary out of the treasury.”
This exception was made in the same manner in former tax laws; and was made because the tax on the two classes of offices was imposed by different sections of these laws, and therefore the exception was proper to avoid the appearance of a double tax on one of the classes. The tax was imposed by different sections because the tax on one class was collectable by the sheriff, while the other was to be deducted at the time the salary wras audited and paid. There is no repugnancy be *19 tween the 2d section of the act of ’53-4 imposing a tax on officers receiving their salaries out of the treasury, and the 6th, of the act of ’55-6, imposing a tax on officers other than the former; any more than there would be between the same sections if contained in the same act. The repugnance is between the dots, not the sections ; and consists in the faet that each act is a complete tax law. But while .the exception creates no repugnance between^ the two sections, it would, perhaps, have had some effect in preventing the legislature from omitting, in the act of ’55-6, the 2d section of the act of ’53-4, if they intended to continue, the tax imposed by that section, as it wou,d have involved that intention in greater doubt.
The second of these omissions is the tax on every license to a merchant or mercantile firm to sell provisions or agricultural commodities, the growth or production of this State, or some of the United States, imposed by the 6th section of the act of ’53-4. This section is wholly omitted in the act of ’55-6, and I think was omitted for the purpose of discontinuing the tax, no doubt with a view to encourage agriculture. It was probably considered unjust and impolitic to impose an additional tax upon a merchant whose stock in trade consists, in part, of provisions or agricultural commodities. 'A person whose stock in trade consists wholly of such articles is a merchant, and is embraced by the 14th section of the act of ’55-6, imposing a tax on every license to a merchant; and by that only, unless there be some other provision of the law taking him out of' the operation of that section, or subjecting him to some other and additional tax. It is not probable, therefore, that the legislature would have omitted, in the act of ’55-6, the 6th section of the aet of ’53-4, if they had intended to continue the tax imposed by that section; though there is no positive repugnancy between that *20 sec^0rL ail(l the 14th section of the act of ’55-6, any more than there would he if both were embraced in the latter act. ' As before stated, the repugnancy is between the two acts, and not the two sections.
The third and last of the omissions is that part of the 10th section of the act of ’53-4 which imposes a tax “ on every license to a person who may receive rough frame work of any description, -from other States, and. put it together in- this; for the purpose of sale.” This tax probably was found by experience to be wholly unproductive, and therefore was discontinued by being omitted in the act of 1855-6.
Upon the whole, my conclusion is, that the act of 1855-6 is a perfect tax law, embracing all the taxes intended to be imposed for the support of government; that it omitted the tax on collateral inheritances for the purpose of discontinuing it; and therefore, that it repealed by implication the 15th section of the act of 1853-4. ' Other views might be presented in support of the same conclusion, but it is unnecessary to do so, and my opinion has already been too much prolonged. The result of it is that the judgment of the Circuit court ought to be reversed, and the motion overruled.
Allen, P., and Daniel and Pobertson, Js., concurred in the opinion of Moncure,. J.
Lee, J., dissented.
Judgment reversed:.